741 A.2d 462

MIKE SMITH PONTIAC, GMC, INC.

v.

MERCEDES–BENZ OF NORTH AMERICA, INC.

No. 156, September Term, 1998.

Court of Appeals of Maryland.

Oct. 15, 1999.

Reconsideration Denied Dec. 3, 1999.

544

Scott A. Livingston (John J. Leidig and Lydia B. Hoover, Rifkin, Livingston, Levitan & Silver, LLC, on brief), Baltimore, for petitioner.

Paul Walter (William C. Sammons, Michael H. Tow, Tydings & Rosenberg, LLP, on brief), Baltimore, for respondent.

Argued before Bell, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL, and ROBERT L. KARWACKI, (retired, specially assigned), JJ.

RODOWSKY, Judge.

This case involves a judgment creditor's claim for post-judgment interest on a judgment recorded in Maryland based on the judgment of a federal court in Florida. The Florida judgment has been satisfied by payment that includes post-judgment interest at the nationwide federal rate. The judgment creditor claims that the Maryland judgment is not thereby satisfied unless payment of post-judgment interest at the higher Maryland rate has been paid.

In the 1980s the petitioner, Mike Smith Pontiac, GMC, Inc. (Smith), and the respondent, Mercedes-Benz of North America, Inc. (M–B), became involved in a dispute over the transfer of a M–B franchise dealership in Florida. Smith filed suit in federal court; after a jury trial, on July 24, 1992, the United States District Court for the Middle District of Florida, Orlando Division (the Florida District) entered a "final judgment on jury verdict" in Smith's favor in the amount of $1,600,000.

Both Smith and M–B appealed to the United States Court of Appeals for the Eleventh Circuit, *see Mike Smith Pontiac, GMC, Inc. v. Mercedes–Benz of N. Am., Inc.,* 32 F.3d 528 (11th Cir.1994), *cert. denied,* 516 U.S. 1044, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996), which affirmed in part, reversed in part

and remanded. The Florida District entered a "final judgment on remand" in favor of Smith on February 29, 1996, in the amount of $7,530,660.26 "together with postjudgment interest accruing on all of the foregoing sums from July 24, 1992 at the rate provided by law, for which amount let execution issue."

A few days later, on March 4, 1996, Smith filed the federal judgment in the Circuit Court for Harford County, pursuant to the Uniform Enforcement of Foreign Judgments Act (UEFJA), Maryland Code (1974, 1998 Repl.Vol.), §§ 11–801 through 11–807 of the Courts and Judicial Proceedings Article (CJ). The judgment in the record of the circuit court reads as follows:

"July 24, 1992 Judgment entered in favor of the plaintiff, [Smith] and against the defendant [M–B], in the amount of seven million five hundred thirty thousand six hundred sixty and 26/100 dollars ($7,530,660.26), together with costs and attorneys' fees the amount of which is yet to be determined by the court, and together with postjudgment interest accruing on all of the foregoing sums from July 24, 1992 at the rate provided by law, for which amount let execution issue." [1]

On March 7, 1996, seven days after the Florida District judgment was entered, M–B paid this judgment, with federal post-judgment interest (at that time) of 3.51%, for the period from July 24, 1992, to March 7, 1996, by total payment of $8,534,112.01.[2] On March 11, 1996, Smith signed a "Satisfac-

---

1. The costs and attorneys' fees were later determined. That judgment is not involved in the case before this Court.

2. In 1982, Congress amended the federal post-judgment interest rate statute to provide for interest on federal judgments "at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 302, 96 Stat. 25, 55–56 (codified as amended at 28 U.S.C. § 1961 (1994)). The federal post-judgment interest rate is fixed at the time of entry of judgment and does not change as market

tion of Judgment" acknowledging this payment; the satisfaction reads as follows:

> "We, [SMITH] . . . do hereby acknowledge full payment and satisfaction thereof of those judgments rendered on July 24, 1992 and February 29, 1996 . . . to the extent said judgments provide for the payment of SEVEN MILLION FIVE HUNDRED THIRTY THOUSAND SIX HUNDRED SIXTY AND 26/00 ($7,530,660.26) DOLLARS together with interest at the rate of 3.51%, compounded annually, from July 24, 1992 only, in the amount of $8,534,112.01."

M–B filed this satisfaction in the Florida District on March 22, 1996.

On March 4, 1997, approximately one year after M–B paid the Florida District judgment, and approximately three months after M–B paid the attorneys' fees and costs, Smith filed a "Request for Writ of Execution" in the Circuit Court for Harford County. Two days later, that court issued the writ, which a sheriff posted upon real property owned by M–B in Harford County. Smith claimed that the domesticated Maryland judgment, filed in Harford County on March 4, 1996, pursuant to the UEFJA, was governed by Maryland's statutory post-judgment interest rate of 10%,[3] and that interest accrued from the date the Florida District judgment was entered (July 24, 1992), so that M–B owed Smith an additional $1,732,344.28. Smith calculated this amount as follows:

| | | |
|---|---|---|
| "$7,530,660.26 | | Principal Amount of Maryland Judgment |
| "Plus | $2,735,796.03 | Post-judgment interest at Maryland's statutory rate at 10% from 07/24/92 through 03/11/96 [the signing and filing date of the first satisfaction] |
| "Less | $8,534,112.01 | Amount Paid by [M–B] |
| "Remaining | Balance Due | $1,732,344.28." |

conditions change. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 838–39, 110 S.Ct. 1570, 1577–78, 108 L.Ed.2d 842, 854 (1990) ("[T]he interest rate for any particular judgment is to be determined as of the date of the judgment, and that is the single rate applicable for the duration of the interest accrual period.").

**3.** *See* CJ § 11–107(a) ("[T]he legal rate of interest on a judgment shall be at the rate of 10 percent per annum on the amount of judgment.").

In the Florida District, on March 21, 1997, M–B filed an "Emergency Rule 60(b)(5) Motion to Relieve [M–B] of Judgments Which Have Been Fully Satisfied and to Sanction [Smith]." [4] A magistrate judge reported that

"there is no dispute that the Judgment has been satisfied by full payment. The present controversy is the effect of that satisfaction on Plaintiff's claim to additional interest under Maryland law. While this Court has serious doubts about Plaintiff's entitlement to additional interest under federal law or state law, it need not reach that question. At argument, Defendant asked only for an order declaring the Judgment to be satisfied and discharged of record. As this is clearly appropriate, it is respectfully recommended that the Court declare the Judgment satisfied in full and order the Clerk of Court to discharge same accordingly."

Adopting this report, the Florida District granted M–B's motion on May 8, 1997.

Also, in Maryland, M–B had filed a motion for an order to have the Maryland judgment marked "satisfied" pursuant to Maryland Rule 2–626(b), for an order releasing M–B's Maryland property from levy pursuant to Maryland Rule 2–643(c)(1), and for costs and attorneys' fees. The circuit court granted M–B's motion with respect to the order of satisfaction and release of property.

Smith appealed, and M–B cross-appealed the denial of costs and attorneys' fees, to the Court of Special Appeals. *Mike Smith Pontiac, GMC, Inc. v. Mercedes–Benz of N. Am., Inc.*, 123 Md.App. 498, 719 A.2d 993 (1998). Smith presented three questions to the court.

"1. Whether the lower court erred in ruling that filing a foreign judgment in the Circuit Court in full compliance with the Maryland UEFJA did not create a

---

4. Federal Rule of Civil Procedure 60(b)(5) enables a party to move a court for relief from a judgment or order on the ground, among other things, that "the judgment has been satisfied." Fed.R.Civ.P. 60(b)(5).

separate, valid Maryland judgment with independent legal effect subject to Maryland law and Maryland's post-judgment interest rate.

"2. Whether the lower court erred in ruling that a Maryland judgment properly filed and recorded under the Maryland UEFJA and subject to Maryland's 10% post-judgment interest statute can be collaterally attacked by reason of the debtor's subsequent payment of only the lesser amount on the underlying foreign judgment.

"3. Whether the lower court erred in ruling that a form of limited satisfaction of judgment, which acknowledged only receipt of the amount due on the Florida federal court judgment, was equivalent to an accord and satisfaction or complete release of all amounts due on the Maryland judgment properly filed under the UEFJA."

*Id.* at 500, 719 A.2d at 994. The Court of Special Appeals affirmed on the following rationale:

"It is appellant's position that a foreign judgment filed in Maryland becomes a Maryland judgment. Appellant is wrong. As the *Weiner* [*v. Blue Cross of Maryland, Inc.,* 730 F.Supp. 674, 677 (D.Md.1990), *aff'd,* 925 F.2d 81 (4th Cir.), *cert. denied,* 502 U.S. 816, 112 S.Ct. 69, 116 L.Ed.2d 43 (1991) ] court put it, the UEFJA alters no substantive rights or defenses otherwise available to the judgment creditor or judgment debtor. In other words, the *Weiner* court recognized the UEFJA as merely a device to facilitate the enforcement of foreign judgments. Because the Florida judgment filed in Maryland is subject to the defense of satisfaction, *Weiner* ['s characterization of a foreign judgment recorded under the UEFJA as an independent judgment] is of no avail to appellant."

*Id.* at 505–06, 719 A.2d at 997 (citations and footnote omitted).

This quoted passage implicitly disposed of Smith's second question, because the court's conclusion that the UEFJA alters no substantive defenses, combined with the court's treatment of the UEFJA as a facilitating device, meant that

the enforcement of the domesticated judgment could be subsequently challenged by means of the defense of satisfaction.

With respect to Smith's third question, which characterized the payment of the Florida District judgment as "a form of limited satisfaction," the court simply noted that "the Florida judgment filed in Maryland had been fully satisfied." *Id.* at 505, 719 A.2d at 997. This position is supported by the judgment of the Florida District, which found on May 8, 1997, that its judgment had been "satisfied in full." [5]

On December 15, 1998, Smith filed a petition for a writ of certiorari in this Court. Smith presented the following questions for review:

"1. In ruling that a judgment properly recorded under Maryland's UEFJA does not create a Maryland judgment subject to Maryland law, did the Maryland CSA violate the U.S. Constitution, reverse the prior decision of the Court of Appeals, violate Maryland law governing interpretation of Uniform Laws and render Maryland's UEFJA unconstitutional?

"2. Did the Maryland CSA err in ruling that a domesticated foreign judgment which is greater in amount than the original foreign judgment, is satisfied by the judgment debtor's subsequent payment of the lesser original foreign judgment because all defenses available to the judgment debtor in the foreign jurisdiction under foreign law, are equally available in Maryland against the domesticated Maryland foreign judgment?

"3. If the Maryland CSA ruled incorrectly as to Questions 1 and 2, the remaining issue is whether Maryland's postjudgment interest rate applies from the date of entry of

---

**5.** Smith's third question was simply another version of its theory underlying the first question, *i.e.*, that the judgment domesticated in Maryland is independent and governed by Maryland's 10% post-judgment interest rate, and that it follows from this that the *full* satisfaction of the Florida District judgment is not a defense to the enforcement of the domesticated judgment.

the original foreign judgment or from its date of recording in Maryland." [6]

Smith essentially makes the following argument. Under the Full Faith and Credit clause, a foreign judgment cannot be enforced directly in a sister state, but must be made a separate and independent judgment in the enforcement state. The UEFJA simply provides an expedited procedure for doing this. By filing its Florida judgment under Maryland's UEF-JA, Smith obtained an independent judgment subject to Maryland law. Under *Beilman v. Poe*, 138 Md. 482, 487, 114 A. 568, 570 (1921), Maryland law applies the *lex fori* rule of conflict of laws. According to this rule, post-judgment interest is a procedural matter governed by the law of the enforcing state, so that Maryland's 10% statutory post-judgment interest rate governs. Thus, Smith asserts the existence of an independent Maryland judgment, subject to 10% post-judgment interest, which, having been obtained prior to the payment of the original Florida District judgment, cannot be satisfied by the payment of a lesser amount under the 3.51% interest rate carried by that judgment. To hold otherwise, the argument goes, would violate the United States Constitution and Maryland precedent.

M–B submits that satisfaction of a judgment in the rendering jurisdiction satisfies the judgment in any jurisdiction in which it has been domesticated for enforcement purposes. M–B considers that the foregoing proposition is but a particular application of a more general principle under which events affecting a foreign judgment equally affect the judgment in any jurisdiction in which it has been domesticated for enforcement purposes.

## I. Full Faith and Credit and the UEFJA

The Full Faith and Credit clause of the United States Constitution provides that

---

**6.** In its petition for writ of certiorari, Smith admitted that "the CSA did not rule on the third issue [in the certiorari petition]," but it asked this Court to do so "for the sake of justice and expediency."

"Full Faith and Credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

U.S. Const. art. IV, § 1. Congress prescribed the manner of according full faith and credit by the Act of May 26, 1790, 1 Stat. 122 (1790), codified at 28 U.S.C. § 1738 (1994).

Historically, the party seeking to enforce a judgment in a sister state had to bring a separate court action in that state. *See Weiner v. Blue Cross of Maryland, Inc.,* 730 F.Supp. 674, 676 (D.Md.1990) (noting that "[u]nder the common law, the procedure to enforce the judgment of one jurisdiction in another required the filing of a new suit in the second jurisdiction to enforce the judgment of the first," and that "[t]he suit on the judgment was an independent action"), *aff'd,* 925 F.2d 81 (4th Cir.), *cert. denied,* 502 U.S. 816, 112 S.Ct. 69, 116 L.Ed.2d 43 (1991). As the United States Supreme Court stated long ago,

"[b]y the law of the 26th of May, 1790, the judgment is made a debt of record, not examinable upon its merits; but it does not carry with it, into another state, the efficacy of a judgment upon property or persons, to be enforced by execution. To give it the force of a judgment in another state, it must be made a judgment there; and can only be executed in the latter as its laws may permit."

*M'Elmoyle v. Cohen,* 38 U.S. (13 Pet.) 312, 325, 10 L.Ed. 177, 183 (1839). Similarly, in *Bauernschmidt v. Safe Deposit & Trust Co.,* 176 Md. 351, 4 A.2d 712 (1939), this Court refused to attach a husband's spendthrift trust, located in Maryland, to satisfy a California court's decree for separate maintenance on the ground that, under Maryland law, the income of such a trust was not attachable, and

"[w]hen the enforcement of a foreign judgment or decree is sought in this state, it can only be done in accordance with the provisions of the law applicable to local judgments and decrees. 'To give it the force of judgment in another State,

it must be made a judgment there, and can only be executed in the latter as its laws may permit.'"

*Id.* at 355, 4 A.2d at 713 (citations omitted) (quoting *M'El-moyle,* 38 U.S. (13 Pet.) at 325, 10 L.Ed. at 183).

In order to facilitate the enforcement of judgments, in 1948 the National Conference of Commissioners on Uniform State Laws, and the American Bar Association, proposed the Uniform Enforcement of Foreign Judgments Act (UEFJA), which would permit the registration of foreign judgments. *See* 13 U.L.A. 181 (1986) (including the 1948 version of the Act). In their Prefatory Note, the Commissioners stated:

"The mobility, today, of both persons and property is such that existing procedure for the enforcement of judgments in those cases where the judgment debtor has removed himself and his property from the state in which the judgment was rendered, is inadequate. By this act procedure is made available under which the judgment creditor can effectively obtain relief...."

*Id.* Section 15 of the 1948 UEFJA provided that "[s]atisfaction, either partial or complete, of the original judgment or of a judgment entered thereupon in any other state shall operate to the same extent as satisfaction of the judgment in this state, except as to costs authorized by section 14." *Id.* at 204. The latter section provided that "[w]hen a registered foreign judgment becomes a final judgment of this state, the court shall include as part of the judgment interest payable on the foreign judgment under the law of the state in which it was rendered...." *Id.* at 203.

In 1964, the National Commissioners amended the UEFJA, eliminating the sections noted above, as well as the right of the judgment debtor to raise "substantive" defenses, such as counter-claim or set-off, to the foreign judgment, and otherwise streamlining the Act's procedures. The Prefatory Note stated:

"This 1964 revision ... adopts the practice which, in substance, is used in Federal courts [under 28 U.S.C. § 1963]. It provides the enacting state with a speedy and economical

method of doing that which it is required to do by the Constitution of the United States. It also relieves creditors and debtors of the additional cost and harassment of further litigation which would otherwise be incident to the enforcement of the foreign judgment."

*Id.* at 150. Maryland adopted the 1964 version of the UEFJA in 1987. *See* Chapter 497 of the Acts of 1987.

■ In *Weiner,* then district judge Paul Niemeyer discussed Maryland's UEFJA in deciding whether a judgment originally entered in the state courts of Florida, and subsequently filed in Maryland under the UEFJA, was removable from the Circuit Court for Baltimore County to the United States District Court for the District of Maryland, where the judgment debtor intended collaterally to attack the judgment on federal preemption grounds. *Weiner,* 730 F.Supp. at 675–76. Noting that under common law a suit filed to enforce the judgment of a sister state was an "independent action, and thus was removable," and that the UEFJA was not intended to alter the substantive rights of parties, Judge Niemeyer concluded that the UEFJA did not alter the removability of a cause of action, and denied the judgment creditor's motion to remand. He stated:

"When the Uniform Enforcement Act was revised in 1964, the procedure was modified to parallel that established by 28 U.S.C. § 1963, which allows a prevailing party to enforce a federal district court judgment by registering it in another federal district. Registration pursuant to 28 U.S.C. § 1963 is considered 'the equivalent of a new judgment of the registration court.' *See Stanford v. Utley,* 341 F.2d 265, 268 (8th Cir.1965).

. . . .

"While the Uniform Enforcement Act eliminates the need for filing of a complaint and following other procedures, it does not purport to alter any substantive rights or defenses that otherwise would be available either to the judgment creditor or the judgment debtor if suit were filed to enforce that foreign judgment. Since the judgment debtor would be

entitled to remove to federal court an independent action to enforce a judgment that satisfied the provisions of 28 U.S.C. § 1441, the adoption by a state of an act merely to streamline the procedure should not alter the right of removal which was created by Congress."

*Id.* at 677 (citation omitted). The principle to be drawn from this decision is that because the UEFJA is intended "merely to streamline the procedure" of filing a new suit, and not to alter substantive rights, whatever rights or defenses a party may have had with respect to an independent action in the enforcement state, that party also has with respect to the judgment filed under the UEFJA. *See also Guinness PLC v. Ward,* 955 F.2d 875, 891, 892 (4th Cir.1992) (adopting the construction of the UEFJA in *Weiner* and noting further that "the Act was designed merely as a facilitating device and was not intended to alter any substantive rights or defenses which would otherwise be available to a judgment creditor or judgment debtor in an action for an enforcement of a foreign judgment").

■ In view of this, the assertion by the Court of Special Appeals that "[Smith's] position that a foreign judgment filed in Maryland becomes a Maryland judgment . . . is wrong" is an overstatement.[7] *See Mike Smith Pontiac,* 123 Md.App. at

---

7. The Court of Special Appeals stated that *"Osteoimplant Tech [nology, Inc. v. Rathe Productions, Inc.,* 107 Md.App. 114, 666 A.2d 1310 (1995), *cert. denied,* 341 Md. 648, 672 A.2d 623 (1996)] dispose[s] of [Smith's] notion that a 'foreign judgment, filed in Maryland, becomes a Maryland judgment in every conceivable way.' " *Mike Smith Pontiac,* 123 Md. App. at 504–05, 719 A.2d at 997. In *Osteoimplant,* the Court of Special Appeals refused to grant a party's motion to vacate a judgment that had been filed in Maryland under the UEFJA. The movant asserted that the foreign judgment which had been entered by default had failed to credit substantial payments made by the judgment debtor some two years before the default. That party argued that, under the language of CJ § 11–802(b) (a "filed foreign judgment has the same effect and is subject to the same . . . proceedings for . . . vacating . . . as a judgment of the court in which it is filed"), the filed foreign judgment became a Maryland judgment "in every conceivable way" and that a Maryland circuit court could vacate the judgment. The Court of Special Appeals disagreed on the ground that "some issues are not permitted to be relitigated anywhere because of principles of *res judicata* and collateral

505, 719 A.2d at 997. Precisely because the UEFJA is merely a "facilitating device," the filing of a foreign judgment under the UEFJA indeed does result in a Maryland judgment, just as if the filing party had chosen to enforce the foreign judgment by initiating a separate action in this state. It does not follow, however, that the domesticated judgment can have no reference to the original judgment, as we shall explain in Parts III, IV, and V, *infra*.

## II. Rate of Post–Judgment Interest in Maryland

■ The Maryland rule of conflict of laws is that the rate of post-judgment interest on a foreign judgment enforced here in a separate action is determined by the law of the forum (*lex fori*), *i.e.*, by the Maryland rate, and not by the rate of the judgment rendering state (*lex loci*). *See Picking v. Local Loan Co.*, 185 Md. 253, 44 A.2d 462 (1945). That case was a proceeding in Maryland to enforce a confessed judgment obtained in Illinois. The Court found that the transcript of the Illinois judgment offered by the plaintiff was insufficient evidence of the foreign judgment, and remanded the case in order to permit the plaintiff to amend its pleadings. *Id.* at 264, 44 A.2d at 468. Offering guidance for the proceedings on remand, the Court stated:

---

estoppel." *Osteoimplant Tech.*, 107 Md.App. at 118, 666 A.2d at 1312. The court held that it could not vacate a judgment from a foreign jurisdiction except in the limited circumstances of " 'lack of personal or subject matter jurisdiction of the rendering court, fraud in procurement (extrinsic), satisfaction, lack of due process, or other grounds that make a judgment invalid or unenforceable.' " *Id.* at 120, 666 A.2d at 1312 (quoting *Matson v. Matson*, 333 N.W.2d 862, 867 (Minn.1983)). While the Court of Special Appeals was correct that a filed foreign judgment does not become a Maryland judgment "in every conceivable way," if only because it still has some reference to the original foreign judgment and is enforceable only if the latter is valid, it does not follow from the court's decision in *Osteoimplant* that a foreign judgment filed under the UEFJA does not become a Maryland judgment. Indeed, the *Osteoimplant* court treated the filed foreign judgment in the same way it would treat a Maryland judgment entered on a claim or in an action brought to enforce a foreign judgment—it refused under principles of *res judicata* and collateral estoppel to relitigate substantive issues encompassed by the judgment.

"The defendant complains that the lower court in its judgment allowed interest on the Illinois judgment from the date the Maryland suit was entered. In this she was not injured. There was, of course, no proof of the legal rate of interest in Illinois, but interest was allowed at the legal rate in Maryland.... The allowance [of interest] is governed by the law of the forum. *Beilman v. Poe,* 138 Md. 482, 487[, 114 A. 568]."

*Id.* at 265, 44 A.2d at 469.

*Beilman,* relied upon by the Court in *Picking,* involved a claim, based upon a New York state court judgment, filed in a Maryland state court receivership. The claimant-judgment creditor complained that it had not been allowed accrued post-judgment interest under New York law and contended that this violated the full faith and credit clause. This Court said that that clause "has reference to the *fact* and *validity* only of judgments and not to the *effect* or the *manner* of their enforcement. That is governed and controlled by the *lex fori.*" 138 Md. at 486, 114 A. at 570. Under Maryland law the receivership court was "authorized to disregard interest in distributing the assets of insolvents." *Id.* at 487, 114 A. at 570. Speaking more generally, the Court said that "[i]t has been held in quite a number of jurisdictions in this country and elsewhere that the allowance of interest on foreign judgments is determined by the *lex fori.*" *Id.*[8]

*See also Bauernschmidt,* 176 Md. at 355, 4 A.2d at 713 ("When the enforcement of a foreign judgment or decree is

---

**8.** This Maryland rule of conflict of laws is the minority view. *See* 2 J.H. Beale, *A Treatise on the Conflict of Laws* § 420.1, at 1338 (1935) ("A foreign judgment, by the prevailing view, bears interest according to the law of the place where it was rendered...."); H.F. Goodrich, *Handbook of the Conflict of Laws* § 91, at 257 (3d ed.1949) (same); P.H. Vartanian, Annotation, *Law of the Forum as Governing the Right to and the Rate of Interest as Damages for Delay in Payment of Money or Discharge of Other Obligations,* 78 A.L.R. 1047, 1064 (1932) ("[A] line of cases which constitute the weight of authority hold[s] that the law of the state of the rendition of the judgment controls the rate of or right to interest, as against the law of the state in which it is sought to be enforced.").

sought in this state, it can only be done in accordance with the provisions of the law applicable to local judgments and decrees."); *Hospelhorn v. General Motors Corp.*, 169 Md. 564, 577, 182 A. 442, 447 (1936) ("No execution can be issued upon such [sister state] judgments without a new suit in the tribunals of other states; and they enjoy, not the right of priority or privilege or lien which they have in the state where they are pronounced, but that only which the *lex fori* gives to them, by its own laws, in their character of foreign judgments." (internal quotation marks omitted) (quoting *Cole v. Cunningham*, 133 U.S. 107, 112, 10 S.Ct. 269, 270, 33 L.Ed. 538, 541 (1890))).

■ Moreover, Maryland's conflict of law rule has not been changed by the UEFJA. CJ § 11–802(b) in relevant part provides that "[a] filed foreign judgment has the same effect . . . as a judgment of the court in which it is filed."

### III. Maryland Defenses to Enforcement

Whether Smith's Maryland judgment results from a separate suit on the foreign judgment in this state, or a filing under Maryland's UEFJA, it is appropriate for this Court to examine whether the Florida District judgment has been satisfied.

· The Fourth Circuit did just this in *Guinness PLC v. Ward*, 955 F.2d 875 (4th Cir.1992), a case heard under diversity jurisdiction. Although this case concerned an English judgment filed pursuant to the Maryland Uniform Foreign Money–Judgments Recognition Act (UFMJRA), CJ §§ 10–701 through 10–709, the Fourth Circuit described the UFMJRA and the UEFJA as "complementary," discussed the *Weiner* account of the UEFJA, and emphasized the language of CJ § 10–703, which makes the "foreign [nation] judgment . . . enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit." *Id.* at 889–91.

*Guinness PLC* involved a money judgment entered by the High Court of Justice in London, England (the High Court) against Ward. Ward appealed, but meanwhile Guinness initi-

ated a suit in the District of Columbia involving an attorney's lien that Ward had asserted against Guinness. During the pendencies of this suit and of the appeal in England, Ward entered into negotiations for a settlement with Guinness of all claims; this resulted in a preliminary letter agreement in 1987 which provided that Guinness would render the High Court judgment against Ward unenforceable. In 1988, Guinness sued in the United States District Court for the District of Maryland to enforce its High Court judgment under Maryland's UFMJRA. Guinness contended that it never finally approved the settlement, while Ward contended that Guinness simply had breached it. The district court granted Guinness's motion for summary judgment in part because it concluded that a post-judgment settlement, or accord and satisfaction, was not a basis for refusing to recognize a foreign money judgment under the UFMJRA. *Id.* at 877–81.

On appeal, the Fourth Circuit opined that "the Maryland Court of Appeals would hold that it was not the intent of the Maryland legislature in enacting the [UFMJRA] to totally prohibit a foreign judgment debtor from raising a post judgment settlement as a defense to a recognition and enforcement action brought by the judgment creditor." *Id.* at 886. Specifically, the court found that CJ § 10–702 (requiring the foreign judgment to be "enforceable where rendered") allowed Ward to raise the defense that the post-judgment settlement extinguished the High Court judgment by operation of law, and stressed that "the 'where rendered' language of this provision would appear to require a recognition court to focus on the law of the rendering country in making such determination." *Id.* at 889. The court also found, under the language of CJ § 10–703 quoted above, that

"a foreign money judgment entitled to recognition is only enforceable to the same extent that a sister state judgment entitled to full faith and credit would be under the same circumstances. Thus, we believe that any defenses and counterclaims which could be raised regarding the judgment's enforcement, as opposed to its recognition, if the judgment was that of a sister state and entitled to full faith

and credit may also be raised against the enforcement of the foreign judgment. Accordingly, we find that a foreign judgment debtor may raise a post judgment settlement under § 10–703 as a defense not to the recognition of the judgment but rather to its enforcement or degree thereof."

*Id.* (footnote omitted). The Fourth Circuit decided, however, not to remand the case for a determination of these issues because Ward had failed to inform the High Court or the English appellate court of the settlement allegedly reached during the pendency of the English appeal, and thus was judicially estopped from asserting the settlement as a defense in the district court proceeding. *Id.* at 893, 898–99.

As noted above, the Fourth Circuit based its analysis in part on the analogy between the UFMJRA and the UEFJA. In this regard, the court observed that

"the language of § 11–805(b) of the [UEFJA, allowing the creditor to bring a separate action as an alternative to filing under the Act,] when it is remembered that the Act was designed merely as a facilitating device and was not intended to alter any substantive rights or defenses which would otherwise be available to a judgment creditor or judgment debtor in an action for enforcement of a foreign judgment, supports our conclusion that any defenses ordinarily available to the enforcement of a Maryland judgment, and accordingly a sister state judgment which is entitled to full faith and credit, is also available to the enforcement of a foreign country judgment which is entitled to recognition under the [UFMJRA]...."

*Id.* at 892 (citations omitted).

█ The passage above in particular, and the Fourth Circuit's decision in general—that Ward, had he not been judicially estopped, could have raised the defense of a post-judgment settlement to the enforcement of the foreign judgment— indicate that the issue in the instant case should not depend upon whether Smith filed its Florida District judgment under the UEFJA or whether it brought a separate action in Maryland to enforce that judgment. In either case, the issue is

whether M–B has a "defense[ ] ordinarily available to the enforcement of a Maryland judgment," *i.e.*, the judgment recorded in the Circuit Court for Harford County. And just as the *Guinness PLC* court looked in part to the original English judgment and to the facts relevant to determining whether the debtor had satisfied that judgment, in order to determine if there was a defense to the enforcement of that judgment, so this Court may look to the original Florida District judgment and to the facts relevant to determining whether the debtor has satisfied that judgment, in order to determine if M–B has a defense to its enforcement in Maryland. In addition, because the UEFJA "was not intended to alter any substantive rights or defenses which would otherwise be available to a judgment creditor or judgment debtor in an action for enforcement," this Court may look to common law defenses to enforcement that have been and continue to be available under Maryland law.

Some defenses challenge the validity of the original judgment. For example, in *Concannon v. Hampton*, 584 P.2d 218 (Okla.1978), the court noted that "[d]raftsmen of the [1964 UEFJA] act as well as the 1948 act were primarily concerned with preserving a defendant's right to assert defenses as to the *validity* of the foreign judgment, to insure that the judgment was entitled to full faith and credit." *Id.* at 221 (citing *Gem Mfg. Corp. v. Lents Indus., Inc.*, 276 Or. 87, 554 P.2d 166 (1976) (in banc)). In addition, in enforcement proceedings prior to the UEFJA, post-judgment defenses have been recognized that do not seek to challenge the validity of the judgment, but instead its enforcement. *See Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 275, 56 S.Ct. 229, 233, 80 L.Ed. 220, 227 (1935) (noting, as one bar to the enforcement of a judgment, the defense "that it has ceased to be obligatory because of payment or other discharge"); 2 J.P. Poe, *Pleading and Practice in Courts of Common Law* § 404C, at 382 (Tiffany 5th ed. 1925) (Poe) (referring to "defenses arising since the recovery of the judgment, such as payment, release, limitations, discharge in insolvency or bankruptcy").

For this reason, some courts distinguish between the domestication (or recognition) of a judgment and its enforcement. For example, in *Sun First National Bank of Orlando v. Gainesville 75, Ltd.*, 155 Ga.App. 70, 270 S.E.2d 293 (1980), the court recognized that the "Florida judgment [there involved] is entitled to full faith and credit and domestication in Georgia," but the court noted that the judgment debtor had "raised [the defense of partial payment] which put into issue the extent of the enforceability of the judgment." *Id.* at 296. *See also Guinness PLC*, 955 F.2d at 889 ("[U]nder the [UFMJRA] questions of whether a judgment should be recognized are distinct and separate inquiries from those concerning whether such a judgment once recognized is entitled to enforcement.").

■ The distinction between recognition and enforcement applies in the instant case. Smith did indeed domesticate its Florida District judgment by filing it under Maryland's UEFJA. While this Court must recognize this judgment as a valid Maryland judgment, this Court also may inquire into post-judgment defenses in order to determine the extent to which it is enforceable. *Cf. Barry Properties, Inc. v. Blanton & McCleary*, 71 Md.App. 280, 292, 525 A.2d 248, 254 (noting that a motion under Md. Rule 2–643(c)(1) to declare a judgment satisfied by a post-judgment accord and satisfaction is "in recognition of the judgment" and not a collateral attack upon its validity), *cert. denied*, 310 Md. 490, 530 A.2d 272 (1987).

■ M–B asserts that "[t]he issue in this case is and always has been whether the satisfaction filed in Florida federal district court . . . serves to satisfy, vacate, or release the filed foreign judgment." Smith, in turn, characterizes the holdings of the lower courts in this case—"that the payment and satisfaction by [M–B] of the Florida judgment, also paid and satisfied the 'Maryland judgment' "—as "the [mistaken] application of foreign law and defenses to [its Maryland] judgment." Although Smith is correct that, under the UEFJA, it has, at least in some sense, an independent Maryland judgment, Smith is wrong to characterize payment as a foreign

defense. It is a Maryland defense to the enforcement of the domesticated judgment.

In *Coane v. Girard Trust Co.*, 182 Md. 577, 35 A.2d 449 (1944), Girard Trust recovered a confessed judgment in Pennsylvania against Coane for approximately $23,000; the execution resulted in a sale of her real property for $50. A few weeks later, Girard Trust filed suit in Maryland, where Coane lived, in order to enforce the judgment against her. Coane defended on the ground that the Pennsylvania judgment was subject to Pennsylvania's Mortgage Deficiency Judgment Act, which required that the value of property sold on execution to a mortgagee be fixed at fair market value, and that, after the entry of the original confessed judgment in Pennsylvania and after the initial filing of the enforcement action in Maryland, the Pennsylvania court had fixed the fair market value of the property at $14,000, and thus reduced the amount owed on the confessed judgment. This Court, treating the original confessed judgment as final and entitled to full faith and credit, affirmed the decision of the circuit court to admit the second Pennsylvania judgment, which indicated the reduction, because:

> "[t]he fact that partial release was decreed between the filing of the declaration and the pleas did not bar an exemplification of the record from admission in evidence. A defendant in an action based on a judgment against him may file a special plea setting up the defense of complete or partial release, or payments made since the rendition of the judgment."

*Id.* at 583, 35 A.2d at 452 (citing, *inter alia*, Poe § 404C).

More recently, in *Young v. Progressive Casualty Insurance Co.*, 108 Md.App. 233, 671 A.2d 515 (1996), the Court of Special Appeals considered a similar issue. Young obtained a default judgment in the District of Columbia against Progressive's insured on a tort claim, enrolled that judgment in the Circuit Court for Prince George's County, and obtained a writ of garnishment against the insurer. The District of Columbia later vacated the default judgment for lack of personal juris-

diction, on which action the Maryland court dismissed the garnishment proceeding. Affirming this ruling, the court, speaking through Judge Cathell (now a judge of this Court) stated:

"The continued enrollment in this State of a judgment vacated by the rendering state is an irregularity and/or a mistake. That mistake, even though made by the foreign court, was a jurisdictional mistake. The Maryland court *may*, under those circumstances, dismiss the Maryland proceedings in their entirety or, as in the case at bar, in part, *i.e.*, solely the garnishment proceedings."

*Id.* at 248, 671 A.2d at 523 (citation omitted). The court's italicized language reflects the fact that, although the garnishment proceedings had been dismissed, "there ha[d] been no formal request that the actual judgment be stricken." *Id.* at 240 n. 1, 671 A.2d at 519 n. 1. Accordingly, the vacating of the D.C. judgment for want of personal jurisdiction undercut the basis on which the Maryland judgment rested and would have resulted, if the defendant had requested it, in striking the Maryland judgment as well.

Thus far we have determined that Smith's Maryland judgment carried interest at the same rate as a judgment originally rendered in Maryland and that M–B was entitled to all defenses against enforcement as would a judgment debtor under a judgment originally rendered in Maryland. The next question is when that interest began to run.

### IV. Date of Accrual of Maryland Interest

 Smith contends that the Maryland rate of interest should be applied to the Maryland judgment from the date as of which judgment was entered in the Florida District. In support of this contention Smith cites *Budish v. Daniel,* 417 Mass. 574, 631 N.E.2d 1009 (1994). In *Budish,* the plaintiff obtained a federal judgment in a copyright infringement action, on March 1, 1993, from the United States District Court for the Northern District of Ohio in the amount of $570,548 " 'plus statutory interest from the date of this judgment forward as set forth in 28 U.S.C. § 1961,' " which at that time

was 3.45%. 631 N.E.2d at 1010. The plaintiff then commenced an action in Massachusetts to enforce the judgment, and the defendant defaulted. The Supreme Judicial Court of Massachusetts, noting its long history of applying the *lex fori* rule, held that the state's 12% statutory interest rate applied to the foreign judgment. *Id.* at 1011, 1012–13. The court also held that this rate applied "from the date of the Federal judgment." *Id.* at 1013 n. 7. At the same time, in response to the defendant's argument that the court's ruling would cause forum-shopping, the court noted that "any party against whom a Federal court enters a monetary judgment can prevent the prevailing party from shopping around for the highest available postjudgment interest rate by promptly satisfying the judgment." *Id.* at 1012.

*Budish*'s conclusion that the Massachusetts rate of interest should be applied under the *lex fori* rule is consistent with Maryland law, as explained above, but *Budish*'s direction to apply that rate from the date on which the federal judgment was entered is inconsistent with Maryland law. *Budish* was not an application of the UEFJA, whereas that uniform law directs that the "filed foreign judgment has the same effect . . . as a judgment of the court in which it is filed." CJ § 11–802(b). Maryland Rule 2–604(b) provides that "[a] money judgment shall bear interest at the rate prescribed by law from the date of entry." The date of entry of a Maryland judgment is governed by Rule 2–601(b) which reads:

"The clerk shall enter a judgment by making a record of it in writing on the file jacket, or on a docket within the file, or in a docket book, according to the practice of each court, and shall record the actual date of the entry. That date shall be the date of the judgment."

It is illogical to treat the judgment recorded in the Circuit Court for Harford County as a Maryland judgment, bearing the Maryland rate of post-judgment interest, and then retroactively to apply that rate of interest to the date of entry of judgment in the Florida District, when there was no Maryland judgment. *Cf. Joplin Corp. v. State ex rel. Grimes,* 570 P.2d 1161, 1163–64 (Okla.1977) (applying the state's UEFJA and its

rule that "[t]he local law of the forum ... determines the methods by which a judgment of another state is enforced," and further noting that the foreign judgment could not become a lien until the day it was recorded in Oklahoma).

We therefore hold that the Maryland judgment carried interest at the rate of 10% per annum from March 4, 1996.

## V. Conclusion

Smith has never contended that satisfaction of the principal amount of the Florida District judgment failed to satisfy the principal amount of the Maryland judgment. Thus, the issue in the instant matter is reduced to whether the payment in full by M–B of the Florida District judgment operates merely as a credit against the Maryland judgment, or whether it discharges the Maryland judgment. Consequently, the swing between the parties in the instant matter is either that M–B has no liability under the Maryland judgment or M–B is liable for three days of interest (March 4 to March 7) at the annual rate of 6.49% (10% Maryland rate less 3.51% federal rate) together with interest on that unpaid balance from March 7, 1996, at the Maryland rate of 10%.

▉ Despite the difference in the two interest rates, we hold that payment in full of the Florida District judgment satisfied and discharged the Maryland judgment. Restatement (Second) of Conflict of Laws § 116 states the general rule to be that

"[a] judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition."

The rationale for the rule, as stated in comment *b* to Restatement § 116, is as follows:

"A judgment creditor will not be permitted to obtain greater relief than that to which he is entitled under the local law of the state where the judgment was rendered. Once the creditor has received the amount due under a judgment for the payment of money, he can obtain no further monetary relief in any state."

E.F. Scoles & P. Hay, *Conflict of Laws* § 24.31, at 958 (1984) (Scoles), agrees, reasoning as follows:

> "Full Faith and Credit requires the second forum to accord a judgment the same effect that it enjoys in the state of rendition, including its discharge, as provided by the latter's law, by payment . . . or by other means such as accord and satisfaction. . . . When a second judgment has been entered recognizing and enforcing a prior judgment before satisfaction of the latter, both remain in effect until one of them has been satisfied."

(Footnote omitted). Scoles reasons that there are "parallel, *consistent* judgments." *Id.* § 24.29, at 956 n.2. He concludes that where "a local judgment recogniz[es] and enforc[es] an earlier sister-state or foreign-country judgment . . . both remain in effect . . . until one is satisfied." *Id.*

The rule advocated by the above national authorities is not, as evidenced by the expressed rationale, a corollary to the majority rule of conflict of laws under which the post-judgment interest rate in the judgment rendering state determines the post-judgment rate in the enforcing state. If that were the reason for the position of the above-quoted authorities, the post-judgment interest rates would always be identical where the enforcing state followed the majority rule, and these authorities would have no reason to address whether payment of one judgment satisfied both. The rationale, however, is that the claim, here, Smith's claim of antitrust violation by M–B, has been merged into the Florida District judgment and that that judgment has been satisfied. The amount judicially determined to be paid as damages for the wrong has been paid, together with interest to compensate for the delay in payment, also as determined by the judgment.

■ Even if we may have read more into the authorities quoted above than their authors intended, we hold, as a matter of Maryland defense to a Maryland judgment, that satisfaction of a money judgment in a sister, judgment-rendering state satisfies a Maryland enforcing judgment, and satisfaction in a sister, judgment-enforcing state satisfies a Maryland rendered

judgment, without regard to whether there is a post-judgment interest differential and without regard to the direction in which any differential might run. There is no unfairness in a judgment creditor's receiving the rate of post-judgment interest which a judgment carries either in the forum where the judgment was obtained or in the forum to which the creditor took the judgment for enforcement. Further, where the judgment-rendering state's post-judgment interest rate is less than Maryland's, the rule for which Smith contends encourages forum shopping. Creditors holding foreign judgments that carry a lower rate of post-judgment interest than do Maryland judgments would be encouraged immediately to record their judgments in Maryland in the hope that, even after the judgment has been satisfied in the judgment-rendering state, some asset of the debtor might be in, or be brought into, Maryland on which execution could be had for the post-judgment interest differential.

Under the rule which we adopt, if the circumstances are that the debtor seeks first to satisfy the judgment in Maryland, either as the judgment-rendering state or as a state in which a judgment rendered in a sister state has been recorded, the debtor will have to pay the judgment at the Maryland rate of interest. Whether, in the event that the rate in the judgment-rendering state is lower, that state will rule that the judgment creditor is liable to the debtor for the interest differential is a question for the courts of the judgment-rendering state. *Cf. Peoples Bond & Mortgage Co. v. Chatkin,* 385 Pa.Super. 639, 561 A.2d 1274 (1989) (where judgment debtor satisfied Pennsylvania rendered judgment, recorded in Arizona, by payment at higher Arizona rate, Pennsylvania judgment was satisfied and judgment creditor held liable to judgment debtor for differential paid in Arizona).[9]

---

9. Smith also contends that full faith and credit requires that Maryland recognize July 24, 1992, as the date of the Maryland judgment. Maryland has recognized the July 24, 1992 date of judgment as the starting date for interest at the federal rate. With respect to the date as of

For all of the foregoing reasons we hold that satisfaction of the Florida District judgment satisfied the Maryland domesticated judgment, without regard to Maryland's higher post-judgment interest rate.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER, MIKE SMITH PONTIAC, GMC, INC.**

---

which the Maryland rate begins to run, however, the analysis is as set forth, *supra*. We have simply held as a matter of Maryland common law that when the Florida District judgment was satisfied, the Maryland judgment was satisfied. According full faith and credit to the Florida District judgment does not compel Maryland to apply its rate from the date of the Florida District judgment in order for the Maryland judgment to be satisfied.